In Re: Bradshaw, No. 1565-98 CnCv (Katz, J., Feb. 17, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                    SUPERIOR COURT
Chittenden County, ss.:                          Docket No.1565-98 CnCv

Post-Conviction Relief
Petition of

SYDNEY I. BRADSHAW

FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND NOTICE OF DECISION

        This matter was tried to the court on January 16, 2004. The court sat at the United States District Court, Burlington, in order to receive a live video feed of Petitioner Bradshaw. The court and prosecutor were able to hear Mr. Bradshaw at all times; he was able to hear whatever was said in court. On the basis of the evidence presented, the following decision is

announced.

## FINDINGS OF FACT

1.      Petitioner Bradshaw was charged with Aggravated Assault–First Degree, a felony, in Vermont District Court.  The officer's affidavit supporting a finding of probable cause states that Bradshaw caused stab wounds on the woman with whom he had been living.  She was taken to the hospital where she was treated for numerous lacerations on her neck and hands.  Her initial statement indicates that although she grabbed the knife first, Bradshaw got it away from her during their fight.  These statements along with others taken directly at the scene strongly implicate Bradshaw in the crime.

2.      Bradshaw was in pre-trial confinement from the May 1997 incident through his February 1998 change of plea.  During that time, at least one attorney, Robert Andres, was discharged, apparently at Bradshaw's request.  Attorney Karen Shingler was then appointed.  A young associate in her office, Peter Shubart, initially began to work on the matter.

3.      At the January 16, 2004 proceeding, Bradshaw indicated that he had defended himself before a jury on a rape charge only a few years before the charge at issue here and had won an acquittal.  Bradshaw also made clear his belief that the complaining witness against him in this case would recant.  He states that her wounds, attributed to his using a knife, were in fact self-inflicted scratches, which are explained by the fact that she is left-handed.  Bradshaw's statements and demeanor throughout this case demonstrate that he follows his own compass, makes his own decisions, and is very much the man in charge.

4.      Bradshaw's belief about the complainant's recantation was

corroborated by the tape recording he submitted as evidence. It was made at a hearing while Bradshaw was in pre-trial confinement. He was seeking to lower his bail and trying to prove that the evidence against him was not as great as the State or its affidavit accompanying the information might suggest. His attorney, Schubart, called the asserted victim, Dina Germain, as a witness. During her testimony, Germain:

- Said she would not be afraid were Bradshaw released;
- recanted from her prior statement the he had slashed her with a knife;
- stated that Bradshaw had not waived the knife at her;
- admitted a prior statement to prosecutors about knife wounds to her neck;
- stated, instead, that her own finger nails had caused the injuries to her own neck;
- admitted pounding on the wall, from fear, to seek aid from the police.

5.     While this recanting, in open court, was not particularly credible, it was clearly enough to raise doubts about the reliability of her testimony at trial or an attempt to prosecute the case without her cooperation. At Bradshaw's later change-of-plea proceeding, Judge Burgess explicitly reviewed the issue. Both Bradshaw and Attorney Shingler replied to the court that they believed the state had at least a prima facie case against Bradshaw. When pressed by Judge Burgess, Bradshaw expressed some hesitancy in his answers. As a result, the judge explicitly told him that he could not change his mind following the plea of "no contest." Bradshaw's response was merely, "I hear what you're saying," to which Judge Burgess forced him to respond further either yes or no. At this point, Bradshaw assented to understanding.

6.       Bradshaw's responses to Judge Burgess's inquiries were in general dissembling.  At several points, he responded, "At this time I do."  Such as when he was asked to acknowledge that he was giving up constitutional rights of confrontation, as well as the effect of entering a plea of no contest.  At other points in the proceeding, usually when pressed, Bradshaw demonstrated capacity for a simple "yes."

7.       While the victim's viability as a witness did not have a substantive effect on the charges pending, we find that this recantation affected Bradshaw's attitude toward his situation and inform his later choices as well as strategy.

8.       As a trial date neared, Shingler, who is very experienced in criminal defense, took over Bradshaw's defense from Shubart.  She and Bradshaw conferred on his prospects for trial.  Above all else, Bradshaw demonstrated that he was resolved to get out of jail as quickly as possible.  While it is normal, and anything but unusual, for those incarcerated to seek their freedom, we are persuaded that at the time Bradshaw and Shingler discussed the possible trial, and the issue of whether to negotiate a plea bargain, his single-minded determination was to get out of jail by any immediate means.

9.       Due in part to the complaining witness's erratic performance at the pre-trial hearing, the prosecution was apparently willing to discuss a plea bargain.  In February 1998, the parties reached a plea bargain, and Bradshaw pled no contest to the original charge of Aggravated Domestic Assault.  He was sentenced four to eight years, all suspended but for the time he had already served.  In other words, although he had pled to a serious, violent felony charge, he had achieved his paramount goal of immediate release from jail.  Even back at the time of his change-of-plea,

Shingler told Judge Burgess that Bradshaw was a "very active participant in his plea negotiations." We are persuaded that he was.

10. Bradshaw now asserts that he was not told that he was pleading to a felony. We reject that assertion. He knew the crime to which he was pleading guilty. At the tape recorded hearing, during which the complaining witness recanted her prior accusations against him, Bradshaw's attorney, Peter Shubart, clearly stated that the charge was "First Degree Aggravated Assault." Judge Burgess, at the change-of-plea, at least twice enunciated "aggravated assault" and clearly reviewed the agreed sentence—eight months to four years. Only a fool might consider such a charge less than serious and less than a felony. Mr. Bradshaw is no such fool.

11. Sydney Bradshaw is a very intelligent, willful and experienced member of the criminal justice community. He served a number of years in New York as a court reporter. In Vermont he has been a Corrections Officer. He is personally familiar with the usual features of probation having served it for sentences in the 70s, 80s, and 90s. The federal detention warrant notes several New York convictions for the following: (1) Criminal Trespass (misdemeanor), Convicted after trial, 3 years Probation; (2) Attempted Burglary (felony), Entered a Plea of Guilty, 5 years Probation; (3) Criminal Possession of a Weapon (felony), Entered a Plea of Guilty, Probation 5 years; and (4) Harassment (violation), Entered a Plea of Guilty, Conditional Discharge. If nothing else, this record demonstrates that Bradshaw was intimately familiar with the differences and distinctions between misdemeanor and felony.

12. Directly following his change-of-plea and resulting conviction, Bradshaw was duly released to begin his period of probation. He went

downstairs in the courthouse to the probation office.   There, he met with the assigned probation officer, was shown the standard conditions of probation, and began an effort to back out of the plea bargain and resulting conviction.  He was, of course, out of jail at this time, but Bradshaw now testifies that, within twenty minutes of gaining his freedom, he was "ready to return to jail" because of dissatisfaction with those standard conditions. We do not believe he was anxious to so return, although he did, within twenty minutes, refuse to sign his conditions of probation, thereby commencing his attack on the conviction.

13.     Bradshaw asserts that this initial attempt to withdraw his plea was due to the fact that Shingler did not advise him of the standard conditions of probation.  This omission does not appear seriously disputed.  Bradshaw makes much of one such standard condition, that he must live in a place approved by the probation officer, but we are not persuaded that this or any of the standard conditions of probation would have played any role in Bradshaw's thinking about negotiating a plea bargain, or accepting one that was offered.  None of the standard conditions are particularly onerous; there is no reason to believe he could not live with any of them.  Even so, at a withdraw hearing held on April 21, 2998, the state conceded the issue and agreed that the standard conditions did not apply to Bradshaw. Nevertheless, Bradshaw continues to raise this issue in support of his claims.

14.     Bradshaw also claims that Shingler told him that he would be able to change his mind, after pleading guilty, so long as he did it within ten days.  He is also sure of a 30 day deadline for filing such a change of mind. Why the law would allow a person only ten days to change his mind, but yet an additional twenty merely to file a piece of paper stating that fact of course makes no sense.  Yet, Bradshaw is unbending in his testimony that

Shingler gave such advice. We consider that testimony rubbish. There are no such provisions in Vermont's Rules of Criminal Procedure. As a former prosecutor and more recently active criminal defense attorney, with perhaps fifteen years experience, there is no way Shingler would have advised Bradshaw of such an opportunity.

15.     We are persuaded by Shingler's testimony that Bradshaw's paramount interest was immediate freedom. He knew what he was doing, at least in his own mind. Bradshaw was confident that, if he could only get out of jail, he would get the conviction vacated. Whether it was through recantations by the complaining witness, feigned ignorance about the nature of the charge, the standard conditions of probation, or simply changing his mind and withdrawing the plea (directly contrary to the Rule 11 advice given by the judge just prior to the change-of-plea, to which he gave a dissembling reply), Bradshaw was confident he could gain both immediate freedom and beat the charge thereafter. That is why he accepted the plea bargain, and that is why he began almost immediately thereafter to undermine it.

16.     It is for these reasons that we also find Shingler's failure to warn Bradshaw about deportation would have made no difference at all. Bradshaw had his plan, was determined to follow it, and did.

17.     Bradshaw was born in Guyana, South America, and came to the United States at the age of 11. His mother was later naturalized, but he never was, apparently in part because of a misbelief that as a minor his citizenship would follow his mother's. Although he speaks very well and is quite articulate, Bradshaw has a unmistakable foreign accent. He frequently uses British forms of speech.

18.     At the time she represented Bradshaw, Attorney Shingler knew that aliens convicted of felonies, particularly those involving assault, were subject to deportation.  It would be obvious to anyone that deportation would be of critical interest to one in Bradshaw's position.  He had lived in America for well over thirty years, having left his native land at age 11.  What life Bradshaw has built for himself has been here.  In discussing the possible plea bargain, Shingler did not advise Bradshaw of deportation risks.

19.     The two never explicitly discussed Bradshaw's citizenship.   While Shingler knew that he was "from New York," she agrees that his speech is not that of a New York native.  They did discuss the question of his returning to New York after his release.

20.     Had Bradshaw not accepted the plea bargain, he would have faced trial.  If convicted of knifing his girlfriend, he would have, in consideration of his not insignificant record, faced a longer prison sentence than that provided in the plea bargain.  Most importantly, there would have been no immediate release.  That is why he accepted the plea offer.  He would have done so with or without knowledge of the risk of deportation.


CONCLUSIONS OF LAW


21.     Bradshaw has presented roughly four factual areas on which he premises his claim for relief.  The first two of these may be disposed of with a brief discussion of the record and our findings.  Bradshaw claims that he was told that he could change his plea after entering it.  He also claims that he was not aware he was pleading guilty to a felony but was

convinced it was only a misdemeanor. Bradshaw has not credibly established that he was unaware of the pending felony to which he was pleading. Given his knowledge of the criminal court system, the seriousness of the penalties facing him, the clear language of Judge Burgess, and the very name of the charge, it is clear that he was not under any mistaken notions as to the crime to which he plead.

22.     Likewise, we find Bradshaw's claim, that he was told he could revoke his plea after entering it, incredible. Bradshaw was told in no uncertain terms by Judge Burgess that his plea could not be revoked, and he acknowledged this warning. Combined with Shingler's testimony that she did not tell him at any time that it could be revoked, there was simply no basis for him to reasonably believe otherwise.

23.     Throughout this proceeding, indeed from nearly the moment he entered his plea, Bradshaw has attacked his agreement from every angle possible. Despite clear and uncontested evidence to the contrary, he has maintained the foregoing claims and has mustered every reason possible to withdraw from his plea bargain. The permissive reading of this evidence reflects a concerted effort on Bradshaw's part to beat his conviction by pleading guilty to gain his freedom and then using any means available to undermine his conviction. Although Judge Burgess could not have more clearly educated Bradshaw as to the foolishness of his scheme, even today, five years later, Bradshaw still declaims that "20 minutes after I was able to read the terms of the plea agreement, I called Ms. Shingler's office immediately and told her to withdraw the plea." (Trans. PCR Hearing, Jan. 16, 2004, at 84). The point is not that his machinations were well-advised; it's that they were Bradshaw's.

24.     Bradshaw's remaining two arguments for relief come under the claim of ineffective assistance of counsel. The standard of review for such

a claim is two pronged.  Strickland v. Washington, 466 U.S. 668, 687–88 (1984); In re Pernica, 147 Vt. 180, 182–83 (1986).  The petitioner must first demonstrate that counsel's performance dipped below an objective standard of professional norms, and second that this performance prejudiced his defense.  In re Hemingway, 168 Vt. 569, 571 (1998).  On both prongs, petitioner bears a heavy burden of persuasion.  In re Dunbar, 162 Vt. 209, 211–12 (1994).

25.      Bradshaw's claim of unawareness about the standard terms of probation does appear to have factual support.  Despite his experience in the criminal justice system and his prior experiences with probation, the evidence does tend to show that Shingler and Shubart did not discuss these conditions with Bradshaw before his plea agreement.  Bradshaw, however, is not clear as to why any of the standard probation terms are disagreeable to him.  His umbrage appears to stem from the fact that these terms were not discussed prior to the agreement.  But mere technical displeasure is not enough.  Aside from any question of the attorney's duty to inform, Bradshaw must show that the standard conditions prejudiced him within the context of the plea bargain.  In re Fisher, 156 Vt. 448, 460–62 (1991)

26.      In this case, Bradshaw has not demonstrated that any particular part of the standard conditions would have affected his plea agreement as otherwise crafted.  Moreover, the state explicitly waived them.  It is therefore impossible to conclude that the attorney's or the court's failure to discuss them had any substantive effect on Bradshaw's defense because he never became subject to them.  In re Fisher, 156 Vt. at 460–62.  Even so, we are not persuaded that these terms were a complete surprise to Bradshaw.  Bradshaw was very involved in negotiating his plea agreement and "wanted to get out of jail very badly." (Trans. PCR Hearing, Jan. 16, 2004, at 49).  Yet, he now claims to have been prepared to return to jail

within the hour based solely on standard probation conditions. He has continued to use these conditions as a basis for attacking his plea even after he was told they do not apply. Rather than evincing displeasure, we find that Bradshaw's insistence on discussing these terms reflects his continuing adherence to the stratagem, of which the plea agreement was a mere evanescent component.

27.     Petitioner's final claim is that his attorney's failure to notify him about the deportation consequences of his plea. As we have previously discussed, deportation as the result of a plea agreement is a serious harm that counsel has a duty to inform a defendant about when counsel has reason to believe that the defendant is an alien. In re Muazhem Al Sayaf, S1087-00 CnC (Katz, J. Mar. 21, 2003).

28.     Under the same reasoning that we used in Al Sayaf, we conclude that Bradshaw will suffer a serious harm from deportation and that Shingler had a duty to inform him of this consequence. Despite Bradshaw's long-term residence in the United States, he still carries a strong foreign accent, and his arrest forms clearly state a South American place of birth. Shingler was well aware at the time of the threat of deportation to permanent residents who pled guilty to felonies. Certainly Bradshaw had a right to be informed of this possibility given the gravity of the consequences, the obviousness of his status, and the ease with which Shingler could have discussed it. Together these triggered a duty in Shingler at least to investigate Bradshaw's citizenship status beyond the mere discussions of "home" that she had with him about New York. We note that the Vermont Supreme Court has discussed this issue in dicta since Al Sayaf and has alluded to its collateral nature. In re Calderon, 2003 Vt. 94, at ¶¶ 14, 18 (Johnson, J. dissenting) (referring to deportation as a collateral matter). We are still persuaded in the reasoning of Al Sayaf and that this reasoning would most likely be adopted by the Court should it face the issue directly.

See People v. Pozo, 746 P.2d 523, 529 (Colo. 1987) (stating that attorney has a duty to inform non-citizen client of deportation consequences).

29.     We therefore conclude that Attorney Shingler's failure even to inquire about Bradshaw's citizenship status violates the objective standards of professional norms and thereby satisfies his burden under the first prong of a Strickland analysis.  Strickland, 466 U.S. at 687–88.  Once petitioner proves that his attorney's actions violated professional standards, however, he must then prove that this violation had a prejudicial effect on his defense such that there is a reasonable probability that he would have gone to trial rather than pleading guilty.  Fisher, 156 Vt. at 460–61.  The standard for this prong is characterized as an objective analysis of a subjective question:

> In Hill v. Lockhart, 474 U.S. 52 (1985), the United States Supreme Court applied Strickland "to challenges to guilty pleas based on ineffective assistance of counsel."  Id. at 58.  The prejudice prong of Strickland was modified in this respect: "[T]he defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Id. at 59.  "Although this modification focuses the inquiry on a subjective question, the answer to that question must be reached through an objective analysis."  Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir.), cert. denied, 488 U.S. 843 (1988).  Contrary to petitioner's assertion, the circumstances confronting him at the time he decided to plead guilty, including the evidence against him and the likelihood of success at trial, are relevant to the inquiry.  Hill, 474 U.S. at 59-60; Hooper, 845 F.2d at 475.

Fisher, 156 Vt. at 460–61.  In the present case, Shingler's failure did not have such an effect.   First, Bradshaw's overriding goal throughout his plea

bargaining negotiations was to get out of jail immediately. All the evidence persuades us that the threat of deportation would not have altered his plans. Rather, it would have been just another ground for attempting to end run his conviction, as indeed it has become.

30. Each action Bradshaw took during the plea negotiation, the change-of-plea, and directly after demonstrates an overarching scheme to first get out of jail and then undo his plea. Despite the weakness of the state's complaining witness, Bradshaw was still facing a very real and serious chance of conviction. The objective medical evidence, initial witness statements, and the testimony of roommates, neighbors, and police were strong enough to give him good reason to accept a plea agreement. Moreover, Bradshaw was no stranger to the criminal justice system and had successfully defended himself previously by taking a charge to trial. We are persuaded that he would have taken this route if he felt there was a realistic possibility of beating the charge.

31. Instead, Bradshaw committed himself to accepting the plea agreement and subsequently escaping the conviction through motions to withdraw it. Whether a calculated gamble that the state's attorney would not reassert charges with weak victim testimony or, more likely, that he could more effectively influence the victim's recantation, Bradshaw's plan was to immediately annul his no contest plea. What the evidence and Bradshaw's actions show is a man very involved in his plea agreement, committed to a course of action, and willing to begrudge any consequences under the belief that they would be removed once the conviction was rescinded. We therefore conclude that any information about the risk of deportation would not have altered his choice of action.

32.     Beyond the evidence of Bradshaw's attitude and decision-making process, there is very little objective information to believe that the threat of deportation would in any case have had any effect on Bradshaw's situation. Bradshaw is being held and deported as a result changes in federal law and INS policy, the biggest changes coming from the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (codified as amended in scattered sections of 8 U.S.C.). This Act was passed as part of a slew of anti-immigration laws designed to curb illegal immigration and its side-effects. Bruce Robert Marley, Comment, Exiling the New Felons: The Consequences of the Retroactive Application of Aggravated Felony Convictions to Lawful Permanent Residents, 35 San Diego L. Rev. 855, 857 (1998). While strengthening the power and authority of the INS to act against immigrants, the Act also began a government crackdown on non-citizens in the U.S. with any criminal background. Id. Governed by 8 U.S.C. § 1101(a)(43) (2000), the INS has broad authority to seize and deport permanent residents who commit any number of innocuous crimes, at any time. Marley, 35 San Diego L. Rev. at 870 (noting that "aggravated felony" through the INS's interpretation can include shoplifting, turnstile-jumping, and simple drug possession). Furthermore, convictions and imprisonment are interpreted loosely with the triggering punishment residing in the "nature of the predicate offense" rather than sentencing. Id. at 868–70. The effects of this law have already been felt by at least one Vermont defendant who was subject to deportation after pleading guilty to two misdemeanors, which the INS reinterpreted as aggravated felonies. In re Calderon, 2003 Vt. 94, at ¶ 4.

33.     In Bradshaw's situation, he already had two felony convictions that under 8 U.S.C. § 1101(a)(43)(F) would have qualified him for deportation.

As previous INS actions have demonstrated, such a conviction made Bradshaw a sitting target for deportation. See generally Marley, 35 San Diego L. Rev. 855 (detailing situations where permanent residents came to the INS's attention by visiting another country, attending a naturalization interview, or further involvement in the criminal justice system). With the INS's liberal interpretation, Bradshaw might have also faced the same threat with a plea agreement that labeled the offense a misdemeanor. See Calderon, 2003 Vt. 94. It is unclear exactly how Bradshaw could have avoided INS action regardless of the information given him or his disposition to those choices. Even a choice for trial and acquittal, despite strong evidence otherwise, would have done nothing to erase his prior convictions. Thus, we are unpersuaded that information about deportation would have had any effect on Bradshaw's case. When coupled with his desire to seek immediate freedom as part of his overall scheme, we are persuaded that such information would only have been ignored or distorted by Bradshaw for later use. Therefore, we conclude that Bradshaw has not established the second prong of Strickland and was not prejudiced by his attorney's failure to counsel on deportation consequences.

Based on the foregoing, petitioner's request for post conviction relief is dismissed.

Dated at Burlington, Vermont_____, 2004 .

_____

_____

Judge